THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NAUTILUS INSURANCE COMPANY**<br><br>v.<br><br>**TRH, LLC,** *et al.* | **CIVIL ACTION**<br><br>**No. 24-5787** |

**Henry, J.**                                                            **March 30, 2026**

<u>**MEMORANDUM**</u>

A woman alleges that she was injured by a henna application in a Philadelphia shop. After she sued the shop in state court, its insurer Nautilus filed the present suit for a declaration that it is not required to defend the shop. The insurer argues that the woman's suit over an injurious henna application does not have the potential of coverage within the insurance policy. Both the insurer and the shop defendants move for judgment on the pleadings.

The question at this stage is whether the Court can determine that there is no potential for insurance coverage, or whether it can ascertain some potential. That question is harder to answer with the scarcity of facts that a judgment on the pleadings requires. For instance, the Court does not know much of substance about henna and its uses. It knows little more about the underlying plaintiff Ms. Derr or the Hashi'z Islamic Store where she allegedly had henna applied. Nevertheless, the Court can determine confidently within only the narrow information before it that there is no possibility of Nautilus's having a duty to defend the defendants below.

## I.    <u>BACKGROUND</u>

On July 31, 2024, Danielle Derr filed a lawsuit in the Philadelphia Court of Common Pleas accusing a shop through two corporate entities, Hashiz, LLC (doing business as Hashi'z Islamic

Store) and TRH, LLC (also doing business as Hashi'z Islamic Store), and the store's owner and operator Rehan Ejaz, of negligence in the application of henna to her on or about May 12, 2021. Derr said she had "suffered an adverse reaction to the product." Underlying Complaint ("Derr compl.") (ECF 1-3) ¶ 14. She alleged that the henna was adulterated with a chemical called para-phenylenediamine, which she said is known to cause allergic reactions—but that was not known to her, because she was neither warned of the risk nor checked for sensitivity.

The defendants in Derr's suit eventually informed the shop's insurer, Nautilus Insurance Company, about the lawsuit. Nautilus here sues for a declaration that it has no duty to defend or indemnify the three defendants in Derr's suit based on her allegations sorting clearly into either of two exclusions in the insurance policy: One for "specified therapeutic or cosmetic services," compl. ¶ 33, and another for "communicable or infectious disease," *id*. ¶¶ 66–69. Before the Court are cross-motions for judgment on the pleadings.

## II.  **FRAMEWORK**

"When a plaintiff moves for judgment on the pleadings, the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020).

As noted below, my review is (usually) limited to the pleadings, Fed. R. Civ. P. 12(c), with some exceptions.

"An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy." *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010); *accord Cadwallader v. New Amsterdam Cas. Co.,* 152 A.2d 484, 488 (Pa. 1959) ("It is clear that where a claim potentially may

become one which is within the scope of the policy, the insurance company's refusal to defend at the outset of the controversy is a decision it makes at its own peril."). If the complaint "might or might not" come within coverage, the insurance company is obliged to defend, so "it is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the insurer's duty to defend." *Jerry's Sport Ctr.*, 2 A.3d at 609 (citation omitted).

## III. __DISCUSSION__

The defendants move for judgment on the pleadings based on their argument that, by showing the potential for insurance coverage in the underlying action, they show Nautilus's duty to defend. Nautilus moves for judgment by arguing the lack of any such potential. I begin by addressing preliminary issues on whether some extrinsic evidence may be considered and which parties are actually at play. I then turn to the arguments on the cited policy exclusions.

### A.  Eight Corners (or Sixteen)

In a motion for judgment on the pleadings, the Court is typically constrained in its review to the four corners of the pleadings in that case. The present complaint includes by attachment both the insurance policy and the underlying complaint, however, and my work is substantially to gauge the match between the insurance policy and the allegations in the underlying complaint. *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 & n.9 (rule in Pennsylvania therefore known as "eight corners").[1] An insurer's duty to defend is "to be determined *solely* by the allegations of the

---

[1] If there were information in the present pleadings that did not exist in the underlying complaint and the insurance policy, that would be properly before me as well. Suppose, for instance, that the insurer alleged that it had not been paid its premium prior to the alleged action, and therefore it should be declared to have no duty for an additional reason. Even simpler, if the defendants answered in this suit by denying facts about policy or procedures in the underlying lawsuit, I would consider that answer. *See State Farm Fire and Casualty Co. v. Chteh*, Civ. Action No. 25-0797, 2026 WL 192484 (E.D. Pa. Jan. 23, 2026) (denying judgment on the pleadings where defendants denied by ignorance the validity of the attached contract). I therefore review the complaint in the

complaint." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006) (citing rule as "well established") (cleaned up, emphasis original). "If the complaint filed against the insured avers facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover." *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987).

Nautilus urges the Court to recognize the nature of henna application by reference to an FDA fact sheet it attaches an exhibit to its motion, but the substance of the fact sheet is not information that can be judicially noticed for this purpose or at this posture. Judicial notice in this context may serve "only to indicate what was in the public realm at the time, not whether the contents of those documents are true." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139 (E.D. Pa. 2012). The fact of FDA's publication of the material is certainly "not subject to reasonable dispute," and perhaps neither would be the fact that "the market was aware of the information contained in" such a public-facing fact sheet, *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P.,* 435 F.3d 396, 401 n.15 (3d Cir. 2006); *cf.* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute" which is "generally known" or "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Although the underlying case might involve some question of what the defendants should have known about the effects of adulterated henna, the case before me is about interpreting the insurance contract. Above all, even if I were to consider the contents of the document, a "fact sheet" by the FDA could only be of use in considering the likely, general, or approved uses of a treatment, but not the realm of its *possible* uses and purposes.

---

present case, its attached policy and underlying complaint, and the answer in the present case. That is four documents, which generally means sixteen corners. *But see infra* note 3.

The defendants also urge me to look beyond the eight corners to a defense raised in their answer, which they refer to as "extrinsic evidence." Defs' Mem. (ECF 25-1) at 5. That defense says that "[t]he Complaint should be dismissed because defendants, in the underlying action, have completely denied any interaction or contact with the plaintiff named therein." Answer (ECF 24) at 1. First, I do not agree that the answer in this case is necessarily extrinsic evidence, since it may offer a factual denial critical to deciding whether judgment on the pleadings is proper, *see supra* note 1, although a defense like this one plainly is. In any event, the defendants' argument that denying any interaction with Derr overcomes the policy's exclusion proves too much. By the same logic, not only would the *exclusion* be inapplicable if nothing happened, but the duty of defense would be inapplicable too: If we take for granted that nothing happened involving the shop in any way, then there was no associated bodily injury, so there was no basis for invoking the policy in the first place, and therefore certainly no duty to defend. That is why the insurer's duty must be gauged against what is alleged by the underlying plaintiff, not what is admitted or denied in the that underlying case.

### B. The Explicitly Insured, the Potentially Insured, and the Not-So-Sure

As noted above, three defendants are listed in the present case. The application of the insurance policy to each is a little different. The policy was issued to TRH, which is therefore explicitly insured. Compl. ¶ 25. The policy also includes a definition of "who is an insured" that includes TRH's members "with respect to the conduct of [its] business," its "managers . . .with respect to their duties as your managers," and its employees "for acts within the scope of their employment by [TRH] or while performing duties related to the conduct of [its] business." ¶ 31 (capitalization changed). Derr's complaint alleges that Hashiz, and Ejaz were each "owner/operators" of the store. ¶¶ 3–4. For the person Ejaz, although it may be the case that he is not insured

based on later-developed facts, he is clearly *potentially* insured within the eight corners of Derr's complaint and the policy. Nautilus's argument that the defendants "fail to actually present any argument that Ejaz was acting in his capacity as a member, manager, or employee," Pl's Resp. (ECF 28) 2, mistakes the standards of the present case for those of the underlying.

The question could be less straightforward for the corporate Hashiz, however a default has been entered against it. Although no motion for default judgment lies—a previous motion was withdrawn by agreement—the likelihood of default judgment suggests that a resolution on the merits would be extraneous at this time. Furthermore, the defendants' motion opens its background section stating "Defendant Rehan Ejaz owns and operates Defendant TRH, LLC ('TRH') (collectively, 'Defendants'), which owns Hashi'z Islamic Store (the 'Store'). *The Store is no longer a defendant in this action*." Defs' Mem. (ECF 25-1) at 1 (emphasis added). Evidently, Hashiz is not therefore one of the movants for judgment. Regardless, because I ultimately rule in Nautilus's favor and deny the motion by (some or all) defendants, the question is of no moment to the analysis.

### C.  The "Special Therapeutic Or Cosmetic Services" Exclusion

At the core of both motions is the question of how Derr's allegations fall clearly within or potentially without the policy's "Special Therapeutic Or Cosmetic Services Exclusion." As that exclusion reads, in relevant part, "this insurance **does not apply to 'bodily injury' . . . arising out of** the rendering of or failure to render **any service, treatment**, advice or instruction **for the purpose of appearance or skin enhancement**, hair removal or replacement, or personal grooming or therapy." Policy (ECF 1-4) at 68 (emphasis added).

Nautilus argues that this exclusion unambiguously excludes the coverage within Derr's allegations. As its first step, it cites other courts that have examined "Specified Or Therapeutic

Services" exclusions and found them unambiguous and applicable in other contexts. Nautilus offers *Certain Underwriters at Lloyds of London Subscribing to Pol'y No. CPS200601660 v. Le*, No. CV 2013-40, 2014 WL 3530364 at *3 (D.V.I. July 15, 2014), in which the court ruled that a pedicure fell within a similar exclusion because it was "beyond cavil that [the underlying plaintiff's] pedicure is a service or treatment rendered by [the pedicurist] to address appearance, personal grooming, or therapy." Its other authorities also refer to other services and treatments, *e.g.*, *Granada Ins. Co. v. Liana's Beauty Salon & Spa*, No. 2021-008057-CA-01, 2022 WL 5265053 (Fla. 11th Judicial Cir. Ct., Sept. 28, 2022) (unambiguous and enforceable exclusion for bodily injury arising out of "plasma fibroblast therapy" based on its being performed by licensed esthetician and citing decision based on technicians' licensure requirement); *Granada Ins. Co. v. Al Falah Enters. Inc.*, No. 2022-023202-CA-01, 2024 WL 1138008 *1 (Fla. 11th Cir. Ct. Mar. 8, 2024) (unambiguous exclusion applicable to infection arising out of manicure, although also falling within bacteria exclusion, where court considered undisputed extrinsic facts that "had they been pled in the complaint, they clearly would have" excluded coverage); *Granada Ins. Co. v. Dominique's Salon & Spa*, No. CACE18-005166 (21), 2019 WL 13201676 at *6-7 (Fla. 17th Cir. Ct. Mar. 25, 2019) (exclusion unambiguous for injuries from hot curling iron dropped onto arm during nail treatment); *Elizabeth Arden Resort Spas, Inc. v. Bonaventure Hotel Assocs.*, 2014 WL 11531885 *23 (S.D. Fla. Nov. 13, 2014) (sexual assault in massage spa, considering some claims under Florida's eight corners standard and some under Connecticut's more permissive standard with extrinsic evidence). Nautilus then argues that applicable Pennsylvania law consistently interprets the phrase "arising out of" in an insurance policy to mean but-for causation rather than proximate causation.

As its second step, Nautilus argues that henna application is within the exclusion. It cites a previous decision by this Court observing that "Henna refers to a traditional dye that is used on

skin and generally lasts one to three weeks," *Light v. Blair*, No. 19-5107, 2020 WL 6262185 at *2 n.5 (E.D. Pa. Oct. 23, 2020) (emphasis by Nautilus), although the statement is obviously footnoted dictum that itself relies only the cited authority "https://en.wikipedia.org/wiki/Henna." It refers to a fact sheet published by the Food and Drug Administration called "Temporary Tattoos, Henna/Mehndi, and 'Black Henna,'" which it attaches as an exhibit and which is available at the FDA's website. The fact sheet warns that henna application "is approved only for use as a hair dye" and not "for direct application to the skin, as in **the body-decorating process** known as mehndi." Pl's Mem. (ECF 26-1) at 22 (emphasis by Nautilus, citing its own Exhibit A). As the fact sheet goes on, "The extra ingredient used to blacken henna is often a coal-tar hair dye containing p-phenylenediamine (PPD), an ingredient that can cause **dangerous skin reactions** in some people." *Id*.

The defendants respond to Nautilus's citations by pointing out that the decisions are not binding (or local) authority, that they resulted from procedures more "heavily regulated" than henna application, Defs' Resp. (ECF 27) at 5, and that the contents of the FDA fact sheet are reviewable at this level only for limited purposes, and not for the truth of their statements. The defendants then argue that Nautilus cannot prevail at this level regardless because it has not shown prejudice, citing the insurer's footnoted concession regarding whether it was shorn of any duties to the defendant due to their late notice. *See* Pl's Mem. (ECF 26) at 10 n.1. The defendants do not provide any positive argument asserting the ambiguity of any terms in the cosmetic services exclusion. They do not offer a reading of the factual allegations in Derr's complaint that would offer the potential for coverage outside the cosmetic services exclusion. At best, they attack Nautilus's arguments that henna application is a *skin enhancement*, although the exclusion reaches "service

[or] treatment . . . for the purpose of *appearance or* skin enhancement." Policy 68 (emphasis added.)

In Pennsylvania, ambiguities in an insurance policy are construed strictly against the insurer. *Standard Venetian Blind Co. v. Am. Empire. Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). In general, "an insured may not complain that his or her reasonable expectations were frustrated by policy limitations that are clear and unambiguous." *Frain v. Keystone Ins. Co.,* 640 A.2d 1352, 1354 (Pa. Super. 1994). Is there the potential, within the terms of Derr's complaint, that the henna application in question would not have fallen within the scope of the exclusion? Or is the policy's exclusion, in the context of the whole policy, sufficiently unambiguous to put the defendants on notice that a henna application would be excluded? *See Cordero v. Potomac Ins. Co. of Illinois*, 794 A.2d 897, 900 (Pa. Super. Ct. 2002).

To answer that question, I must consider what I know about the henna application in this case: Not a lot. I tread carefully here because the context of this application indicates the possibility of something culturally motivated in a way that distinguishes it from the scenes of manicures and skin therapy in Nautilus's cited cases, or even a face painting booth at the fair. In particular, I am cognizant of the defendant shop holding itself out as an "Islamic Store." Derr compl. ¶ 2. This at least suggests that some of what is sold there or what happens inside the store could be related to religious ritual or custom, perhaps in a way that is unfamiliar to outsiders. And that could inform whether an application of henna inside the store would come within the present exclusion. By analogy, consider the Jewish ritual immersion bathhouse called a *mikveh*. It which might otherwise look identical to part of a spa that offers a dunking bath for skin enhancement, commanding an entry fee and requiring patrons to wash themselves completely before entering the bath. Yet, this *mikveh* bath would not be understood by its proprietor, its patrons, or its insurer as being "for"

appearance or skin enhancement. A skin enhancement exclusion that would exclude from coverage, say, burns from an overheated spa faucet would not exclude burns from an overheated *mikveh* faucet. Suppose, then, that a burned plaintiff sued the *mikveh*, whose insurer then sued for a declaration denying coverage, as here. If the underlying plaintiff failed to mention in her complaint that this was a *ritual* bathhouse rather than a day spa, simply pleading that she was burned in a bathhouse, how could the *mikveh* prove within eight (or sixteen) corners that there certainly *would be* the possibility of coverage? Would reference to the fact that it is called "The Easton *Mikveh*" and not "Easton Day Spa for the Purposes of Appearance And Skin Enhancement" be enough?[2]

The place from which to proceed is within the eight/sixteen corners of the pleadings. In the first four corners, it is notable that Derr's complaint contains no further suggestion of a non-cosmetic use for the henna application. To the contrary, it refers to the defendants as being "in the business of one or more of the following: formulating, marketing, selling, and/or applying henna products to the general public." Derr compl. ¶ 6. Derr herself "purchased services . . . include[ing] the application of a temporary henna tattoo," *id*. ¶ 7, which was applied to her arm, *id*. ¶ 9. The defendants "promoted the henna tattoo as a temporary stain," *id*. ¶ 8, not explicitly as a cultural experience. They "held themselves out to be professionals in the application of henna," not religious practitioners, although as Derr points out, they "lacked the proper training and education to perform temporary body art services," *id*. ¶ 22, and failed to accord with the "standard of applicable care of certified temporary tattoo artists, *id*. ¶ 23. These references again cite professional, rather than cultural or religious, standards. Importantly, these allegations are also sufficient to

---

[2] I regret offering an analogy to a practice with which I am only a little more familiar than henna, and I hope it is not too clumsy. Other examples of ritual skin treatments or ablutions I considered are either (nominally) intended to mark or to wash the skin, which might be taken to be "for the purpose of appearance," or they seemed less likely to take place within an insured facility.

conclude that henna at least *affects* appearance, since it is a form of tattoo that stains the skin, and it was being applied to the arm.

In the next four corners, the policy itself is silent as to any suggestion of religious affiliation or practice, referring to the insured only as a "clothing store." *E.g.*, Policy at 15, 47, 68. Finally, nothing within the present complaint or the present answer suggests that the henna application in question was *not* allegedly for the purpose of appearance or skin enhancement.

All of this is enough to determine that the odds of this case arising from a treatment that was *not* intended "for the purpose of appearance or skin enhancement" are very low. However, where the threshold is as low as whether Derr's complaint "*might*" come within the policy, *Jerry's Sport Ctr.*, 2 A.3d at 609 (emphasis added), it is helpful to assess a final source: the briefing.[3] The defendants raise the possibility in briefing their own motion for judgment on the pleadings that the henna application could have been for other purposes.

> It is also entirely possible that. [*sic*] Derr did not obtain a henna tattoo for the purpose of enhancing anything but to experience a cultural tradition. Nautilus' conclusory assertion that henna qualifies as a service for the purpose of appearance or skin enhancement is just a conclusory statement with no bearing on the policy.

Defs' Mem. (ECF 25-1) at 6. In briefing their response to Nautilus's motion, the defendants make no such argument. The argument quoted above is insufficiently developed and without citations to authority. *See* Local Civ. R. 7.1(c). More importantly, it is instructive as to what lies beneath. Were, for instance, the *mikveh* operator to be caught in such a situation, I would expect the argument on what this was "for," *i.e.*, on the purpose of the treatment, to take center stage. I rely on parties to direct attention to their best issues. Lacking almost any argument on that point, I can conclude with

---

[3] Having reviewed everything inside the aforementioned sixteen corners, and having refused to extend that review to the fact sheet and an affirmative defense, it is perhaps surprising that I end by turning my attention to yet two more documents and hitting a record twenty-four corners.

confidence that this henna application was allegedly for the purpose of appearance or skin enhancement and therefore falls within the policy's exclusion.

## IV.    <u>CONCLUSION</u>

Because the lawsuit filed by Derr does not come within the coverage of the defendants' policy with Nautilus, falling within the Special Therapeutic Or Cosmetic Services Exclusion, I need not address Nautilus's secondary argument that an alternate exclusion applies. I will therefore issue an accompanying order granting the motion for judgment on the pleadings by Nautilus and denying judgment to the defendants.